IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ERIN D. PROCTOR, ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 7:18-cv-00087 |
| v. ) | |
| ) | By: Joel C. Hoppe |
| LARRY T. EDMONDS, *et al.*, ) | United States Magistrate Judge |
| Defendants. ) | |

**REPORT AND RECOMMENDATION**

Erin D. Proctor, a Virginia inmate proceeding *pro se*, filed this case pursuant to 42 U.S.C. § 1983, asserting several claims against a number of defendants. By memorandum opinion and order entered on August 14, 2020, the presiding district judge granted Proctor's motion for default judgment as to liability on his 42 U.S.C. § 1983 claim of First Amendment retaliation against defendant Robert Jefferson.[1] The same order referred the matter to me for a hearing and report and recommendation as to the proper amount of damages to be awarded on this claim. (Dkt. Nos. 61, 62.) As noted in that opinion, Rule 55(b) permits the court to conduct hearings or make referrals when it needs to determine the amount of damages in order to enter or effectuate a default judgment. (Dkt. No. 61 at 8.)

On October 21, 2020, I held an evidentiary hearing by videoconference. Although Jefferson was notified of the hearing and given an opportunity to appear, he did not do so. Proctor appeared and testified as the sole witness. He did not submit any exhibits. For the reasons set forth below, I recommend that the court enter judgment in Proctor's favor as against defendant Jefferson, in the amount of $5,000 in compensatory damages.

---

[1] Jefferson is a former employee of the Virginia Department of Corrections ("VDOC") and was not represented by the Office of the Attorney General in this litigation. (Dkt. No. 15 at n.2.)

I.   BACKGROUND

Proctor was a very credible witness.  His testimony came across as honest and sincere, and he did not appear to exaggerate his injuries or the facts of his claims.  The relevant facts from his testimony follow.

**A.  Proctor's History of Incarceration**

Proctor began his term of incarceration in 2007.  When he was first sentenced, he was housed in the jail in the City of Lynchburg.  He then went to Mecklenburg, to Augusta Correctional Center for four years, and then to Green Rock Correctional Center for another four years.  He transferred to Dillwyn Correctional Center in January 2017.[2]  He explained that he was trying to get transferred to Coffeewood Correctional Center, which was closer to his family in Washington, D.C.  After the incident with Jefferson, however, Proctor was transferred to Sussex I State Prison, a level 5 facility.  On February 28, 2020, he was transferred to Keen Mountain Correctional Center, where he is currently housed.

Summarizing his time in the custody of the Virginia Department of Corrections, Proctor testified that, throughout nearly all of his incarceration, he had been housed at lower-level facilities (level 2 or 3 facilities).[3]  He also noted that he was charge-free for nine years before Jefferson brought the false charge against him.  He described himself as an inmate who spoke

---

[2] Proctor did not provide an exact date, but testified that he was at Dillwyn approximately five months, and he left in June 2017.

[3] Green Rock is a security level 3 facility, Dillwyn is a level 2 facility, Sussex I State Prison (where Proctor was transferred, *see* Dkt. No. 1 at 1), is a level 5 facility, and Keen Mountain, where he is currently housed, is a level 4 facility.  While at Green Rock, Proctor was in the "honor pod."  This meant that Proctor had additional privileges, even beyond what general population inmates at the level 3 facility had.  Privileges generally vary by the security level of the facility.  *See generally* VDOC Operating Procedure ("OP") 801.4, *Privileges by Security Level*, available at https://vadoc.virginia.gov/files/operating-procedures/800/vadoc-op-801-4.pdf (last visited Oct. 30, 2020) (describing different privileges afforded at different security levels).  OP 801.4 has an effective date of July 1, 2019, so it did not apply to Proctor's time at Dillwyn or the start of his time at Sussex, but it nonetheless provides illustrative examples of the different types of privileges afforded to inmates at facilities with varying security levels.

and acted respectfully toward correctional officers and other VDOC personnel and who tried to keep his distance from inmates who were doing things that could get them in trouble, such as gambling, drinking, using drugs, or engaging in violence. He also helped other inmates when he could. He spoke sincerely about his desire to just make it through his term of incarceration and get back to his son, who was five years old when he came into prison and is now eighteen.

**B.     April 6, 2017 Events Between Proctor and Jefferson**

After he arrived at Dillwyn in early 2017, Proctor states that he was doing "everything [he] was supposed to do." Defendant Jefferson began to mistreat him, however. One day, Jefferson leaned on Proctor's bed and said, "You a bitch." Proctor told Jefferson that he was going to write him up if he kept bothering him. Approximately one week later, on April 6, 2017, Proctor showed his ID to Jefferson so that he could leave the pod and go to the commissary. Jefferson smacked the ID, which landed across the floor, and said, "Wait, bitch." Although Proctor was upset, he wanted to handle the situation properly and through the proper channels, so he went to the booth in the pod and asked for the sergeant.

Jefferson got angry and started backing Proctor up toward a table, threatening him with his fists balled up and saying, "What you wanna do, Proctor?" According to Proctor, he did not move toward Jefferson at any time, nor did he make any threatening gestures toward Jefferson. Sgt. Jackson came into the pod, pulled Jefferson away from Proctor, and took Jefferson to the watch office.

Immediately afterward, Proctor was taken to segregation and told he would be there for fifteen days. According to Proctor, Jefferson gave a false statement, claiming that Proctor had tried to assault him, resulting in a false disciplinary charge against Proctor. Proctor was charged with attempting to commit aggravated assault on a non-offender and was held in segregation for more than two months—from April 6, 2017 until June 16, 2017—while the disciplinary charge

3

was addressed and while awaiting a transfer. After Jefferson falsely testified at the disciplinary hearing, Proctor was found guilty of that charge, which increased his security level. Proctor was then moved to Sussex I State Prison on June 16, 2017.

Thereafter, Proctor's appeal from the disciplinary conviction was granted in part and his charge was reduced to the lesser-included charge of attempting to commit simple assault upon a non-offender. He claims that, had the charge never been brought, or had it been reduced before he left Dillwyn, he would have remained at a security level 3 facility and never would have been transferred to Sussex.

Because of this, Proctor expressed that he regretted ever telling Jefferson that he was going to write him up and regretted going to the sergeant to complain about Jefferson. Specifically, he regretted engaging in protected First Amendment activity because of the chain of events that followed, primarily the retaliatory charge and his placement in segregation and eventual transfer to Sussex.

In any event, he was transferred to Sussex. Thus, one of the ways in which he was damaged by Jefferson's constitutional violation was by being housed in segregation and housed at a higher security level prison for years afterward. The court discusses next the different conditions in each of these housing assignments.

**C. Conditions at Dillwyn, in Segregation, and at Sussex and Keen Mountain**

    **1. Dillwyn Correctional Center**

Proctor testified that the conditions at Dillwyn were "fine," aside from Jefferson bothering him, and that he enjoyed it there. Dillwyn had a good school where he was studying for the General Educational Development test ("GED"). He felt like he got a lot of attention and support at his GED classes. He was housed in a large dormitory-style room, not a cell. He was

4

on the first bunk, and the officer control booth was very close to him. He generally felt safe there.

While at Dillwyn, Proctor had the opportunity for daily outside recreation and daily inside recreation. Aside from when they had to be on their bed for count and when they had to return for count at meal times and to sleep overnight, he and other inmates were basically free to move about inside the dorm room. He could use the phones, watch television or movies, play chess or games with other inmates, or go to the commissary. In the mornings, he took his GED classes.

Proctor ate his meals in the cafeteria, and the food was good. The inmates were not escorted by officers to the cafeteria; instead, officers directed and watched them. He also described the outside recreation facilities at Dillwyn as "good." The recreation area had weight-lifting stations, volleyball, and a nice field that Proctor enjoyed jogging around. Unlike the difficulties he later faced at Sussex, he did not have problems getting a turn to use the phone at Green Rock, Augusta, or Dillwyn.

He had hoped to stay another year at Dillwyn and then try to get to Coffeewood, where he hoped to see his family more because they would be physically closer. While at Augusta and Green Rock, his family was able to visit him. He was only at Dillwyn for about five months, however, and never got the opportunity for a visit before being transferred.

**2. Segregation**

As noted, Proctor was moved to segregation on April 6, 2017. Proctor described the conditions in segregation as "terrible" and added that he had "never seen anything like that." He was in a cell by himself, and he described the area as being loud all day and all night, with people yelling and some inmates urinating on the correctional officers. He ate in his cell. It was the same food that other Dillwyn inmates received, but he said his appetite was ruined at the time

5

because he was so upset and he was trying to figure out how to fix his situation. He also could not attend his GED classes when he was in segregation, and he was not permitted to interact with other prisoners. He thought outside recreation was offered about once a week, but he did not know for certain how often it was offered because he was too upset to go most of the time. He went only one time during his time in segregation. On that occasion, he was placed in a cage by himself, in a small area like a "dog pen." He said he thought it nonetheless helped his outlook to get out on that one occasion.

### 3. Sussex & Keen Mountain

The conditions and situation at Sussex were starkly different from Dillwyn's general population and significantly more restrictive and dangerous than the conditions he had faced at Dillwyn or any of his previous institutions. He described it as "almost torture" and like he was "in hell." He said his experience has "been miserable" and "very hard on him" since he has been away from the lower-level facilities. He explained that his "mind has not been right" and that he has been "stressed out" since coming to Sussex. He also has had some physical manifestations that he attributes to the stress, although the only one he identified was severe constipation. He stated that he has been trying now for more than three years to get back to a lower-level facility. He emphasized that he had "peace" at the lower levels, but at Sussex, he did not.

Proctor described significant violence at Sussex as a commonplace occurrence, frequently resulting in lockdowns. He described one incident in which, in the cell next to him, an inmate stabbed another inmate in the neck, killing him. He says this occurred "right in my face." He also explained that a number of the inmates there have life sentences and simply do not care about getting in trouble for fighting, violence, or other infractions, and that the violence is not well controlled by staff. He summed it up by saying, "You don't know if you're gonna live or die when you're at Sussex."

6

In terms of his living conditions at Sussex, Proctor was housed in a two-man cell with a cellmate, not in the dormitory-style housing he was assigned to while at Dillwyn. One of his Sussex cellmates crafted homemade knives for other inmates, until he got caught. Another cellmate frequently removed all of his clothes and then would masturbate in the cell. Proctor said the correctional officers were aware of the cellmate's actions, but did nothing in response.

The entirety of Sussex was locked down on many occasions because of regular stabbings and fights. He said inmates even stabbed a K-9 dog one time. He explained that he regularly gave people food because he had money in his account and he believed it helped inmates to see that he was a good guy and they should not hurt him. He did not want to fight with other inmates because he just wanted to finish his time and go home, but he was constantly in fear of someone hurting him.

When the pods were not on lockdown, Proctor could move freely around the pod. While in the pod, Proctor occasionally played chess, but mostly kept moving, jogging, or side-stepping, because he did not want to stand still "like a target" and he never knew who might try to hurt him. He explained that he had great difficulty getting access to a phone and that he feared violence from other inmates over trying to use the phone. He had his own television, so he could watch television in his cell.

The inmates were supposed to have outside recreation for about an hour a day. But Proctor said something happened causing frequent emergency lockdowns. As a result, the inmates often were offered outside recreation only once per week.

In terms of meals at Sussex and Keen Mountain, Proctor mostly was fed in his cell, although—at least at Keen Mountain—that was the result of restrictions imposed because of the COVID-19 pandemic. He thought the food was not good and not nearly as good as at Dillwyn or the other lower-level facilities. The meals at Dillwyn often included lots of chicken and more

vegetables, apples, and oranges. At Sussex, he was often fed something called "meat rock." The food also was generally cold by the time it arrived at the cells, unlike at Dillwyn where the food was hot in the cafeteria. Additionally, Proctor once got very sick after eating "pizza casserole" at Sussex, and he believes it was food poisoning.

He described the living conditions at Sussex as "so nasty," referencing the walls, the paint, the floors, water problems, and toilet water sometimes coming up through the drains and flooding the pod. He also had difficulties getting along with some of the other inmates, describing incidents in which gang members believed he had "snitched" on them about a phone, although he had not. He also described difficulties in exhausting administrative remedies at Sussex, which was not a problem at other facilities. For example, he claims that he was frequently denied grievance forms, both there and at Keen Mountain.

Proctor was transferred to Keen Mountain on February 28, 2020. The physical buildings there had recently been renovated and so the physical surroundings were better than Sussex. The facilities have "water problems" like Sussex and sewage sometimes comes up through the floor, but Keen Mountain is nonetheless a "whole lot cleaner" than Sussex. Keen Mountain inmates also have more of a consistent schedule and regular outdoor recreation than at Sussex.

Additionally, Proctor testified that staff shows a concerted effort to protect inmates and keep them safe. He believed that Keen Mountain overall has good officers and does a better job of controlling violence than at Sussex. At the same time, though, all of the inmates that were transferred with him are "the same Sussex people." He still does not feel safe because of the regular violence, and he described one incident in which two inmates beat each other with locks.

According to Proctor, he was eligible for a transfer back to a level 3 facility in March 2020, but he was not transferred.[4] The exact reasons for this are unclear.[5] According to him, his counselor was told by the counselor's boss not to put in for a transfer for Proctor. His counselor has told him, though, that in March 2021, he is likely to be able to transfer back to a level 3 facility.

## II.  DISCUSSION

### A. Injunctive Relief

Proctor emphasized in his testimony that he wants the disciplinary charge removed from his record and that he wants to be transferred as soon as possible to a lower security prison. Although those might be appropriate remedies in some cases, Jefferson—the sole defendant against whom judgment is being rendered—is a former employee of VDOC with no authority to implement any of the injunctive relief sought by Proctor. In the absence of a defendant with such authority, the injunctive relief he seeks cannot be awarded. *See Williams v. Maryland*, No. CIV. A. DKC 09-0879, 2011 WL 3422825, at *8 (D. Md. Aug. 3, 2011) (noting that where the only defendant remaining was not a party from whom the injunctive relief sought could be

---

[4] In an answer and an affidavit filed by other VDOC defendants, they contend that Proctor received an interim security classification review in September 2017, after his conviction was reduced, and he was recommended for transfer to a security level 3 facility at that time. (Answer ¶ 14, Dkt. No. 23; Edmonds Aff. ¶ 13 & Encl. D, Dkt. No. 28-2 at 3, 35–36.) The paperwork actually shows, however, that at the last level of review, the transfer recommendation was rejected. Instead, the transfer was disapproved and the reviewer stated that Proctor should be a security level 4 and should "demonstrate stability at current unit and [security level] before a reduction [would be] warranted." Dkt. No. 28-2 at 36. So, Proctor was not going to be transferred in September 2017, apparently. Regardless, none of this evidence was ever presented by or on Jefferson's behalf. Instead, because Jefferson never answered or responded to the request for default judgment, no evidence from him contradicts Proctor's testimony that he was not eligible for a transfer to a lower level facility until March 2020.

[5] Proctor referenced receiving another disciplinary charge while at Sussex, something about being in an unauthorized area, which he has challenged in court. He also states that he was once taken to a segregation cell when his unit manager falsely accused him of not wearing his mask. Aside from that, he has apparently been charge-free while at Sussex and Keen Mountain. The charge and any charge related to the mask incident logically may have contributed to his not being transferred sooner, but there is insufficient evidence before the court as to when these events occurred and how, if at all, they affected his security level and ability to transfer.

obtained, plaintiff was not entitled to a preliminary or permanent injunction) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 112 (1969)).  Thus, I do not recommend awarding Proctor any injunctive relief.

### B.  Compensatory Damages

The Prison Litigation Reform Act does not permit the recovery of damages for emotional distress or harm absent a physical injury.  42 U.S.C. § 1997e(e).  Proctor confirmed at the hearing that he did not suffer any physical injury as a result of the First Amendment retaliation.  As a result, he is not entitled to damages for emotional harm or injury.  *See id.*

Following a number of other circuits, though, the Fourth Circuit has explained that a prisoner plaintiff who experiences no physical injury may nonetheless be entitled to compensatory damages for the "injury to [his] protected first amendment interest."  *See Wilcox v. Brown*, 877 F.3d 161, 169–70 (4th Cir. 2017).  In so holding, the *Wilcox* court relied on the Sixth Circuit's decision in *King v. Zamiara*, 788 F.3d 207 (6th Cir. 2015), which is very similar to the facts here and discussed in more detail below.

As the Fourth Circuit explained in *Piver v. Pender Cty. Bd. of Educ.*, 835 F.2d 1076 (4th Cir. 1987), substantial damages (as opposed to nominal damages)

> may be presumed in cases in which the actual proof of damages would be difficult or impossible. *See, e.g., Mickens v. Winston*, 462 F. Supp. 910, 913 (E.D.Va.1978) (awarding presumed damages of $250 for racial segregation in prison), *aff'd mem.*, 609 F.2d 508 (4th Cir. 1979).
>
> . . .
>
> In the context of first amendment violations, the concurring opinion in [*Memphis Community School Dist. v. Stachura*, 477 U.S. 299 (1986), Marshall, J., concurring)] quoted with approval the opinion of the United States Court of Appeals for the District of Columbia Circuit in [*Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1984)]: injury to a protected first amendment interest can itself constitute compensable injury wholly apart from any "emotional

10

> distress, humiliation and personal indignity, emotional pain, embarrassment, fear, anxiety and anguish" suffered by plaintiffs. *Hobson*, 737 F.2d at 62 (footnotes omitted), quoted in *Stachura*, 477 U.S. at [315] (Marshall, J., concurring). But such injury can be compensated with substantial damages only to the extent that it is "reasonably quantifiable"; damages should not be based on the "so-called inherent value of the rights violated." [*Id.*] The award must focus on the real injury sustained and not on either the abstract value of the constitutional right at issue, *see* [*Carey v. Piphus*, 435 U.S. 247 (1978)] or the importance of the right in our system of government, *see Stachura*.

835 F.2d at 1082.

In other similar cases, where a First Amendment retaliatory action resulted in a prisoner's transfer to segregation or to a more restrictive prison, courts have found that appropriate damages included compensation for the prisoner being subjected to the more restrictive setting. In *King*, for example, three defendant prison officials were found liable for violating the plaintiff's First Amendment rights when they transferred him to a prison with a higher security classification and more restrictive conditions in retaliation for his exercising his First Amendment rights. 788 F.3d at 207. The district court awarded damages for the time spent at the more restrictive prison facility, and the Eighth Circuit affirmed. *Id.* at 215; *see also Lake v. Flagg*, 319 F.R.D. 252, 258–59 (S.D. Ill. 2017) (upholding jury verdict of $1 in nominal damages and punitive damages in the amount of $10,000 where prisoner was transferred to higher-security penitentiary in retaliation for filing grievances);[6] *King v. Rivas*, Civil No. 04-cv-356-SM, 2006 WL 2583437, at *2 (D.N.H. Sept. 8, 2006) (granting a new trial on damages where jury awarded only $1 to prisoner who was falsely accused of wrongdoing in retaliation for

---

[6] The court in *Lake* suggested that compensatory damages were not available to the plaintiff absent a physical injury, 319 F.R.D. at 258 (citing to two Eighth Amendment cases), but the Seventh Circuit, like the Fourth, allows damages for the violation of a First Amendment right, "aside from any physical, mental, or emotional injury . . . ." *Rowe v. Shake*, 196 F.3d 778, 781–82 (7th Cir. 1999); *see Calhoun v. DeTella*, 319 F.3d 936, 942 (7th Cir. 2003) (explaining the Seventh Circuit's rulings on the issue).

11

filing grievances and consequently placed in segregation, noting that time wrongfully spent in segregation should result in compensatory damages, not just nominal damages).

I conclude that similar damages are available to Proctor here and have been amply proven. As described in the background section, significant differences exist between the life Proctor led at Dillwyn before Jefferson filed the charge against him and the life he led in segregation and then at Sussex. In addition to testimony about it being more difficult to exercise his First Amendment rights in segregation and in the higher-security prisons (in part because of difficulty obtaining grievance forms), Proctor described in detail the significant restrictions for the time he spent in segregation and the violent and restrictive atmosphere at Sussex and now at Keen Mountain. While not as restrictive as segregation, at least some of his time at those higher-level institutions, which flowed directly from the false charge against him, is compensable because illegal retaliation caused that harm. Jefferson's conduct also has made Proctor less likely to exercise his First Amendment rights, as he testified, repeatedly stating that he wished he had never done so.

Although it is difficult to quantify these types of damages, I conclude that $20 per day for Proctor's time in segregation and $5 per day for his time at Sussex, are appropriate amounts. This is generally within the range of damage awards granted or upheld in similar cases. *See, e.g.*, *King*, 788 F.3d at 215 (affirming district court's award of $5 per day for time spent at a more restrictive prison facility); *Trobaugh v. Hall*, 176 F.3d 1087, 1088–89 (8th Cir. 1999) (reversing district court's award of nominal damages of $1 and instead suggesting approximately $100 per day as an appropriate compensatory award for the deprivation of First Amendment rights resulting from a higher security classification and the plaintiff being held in segregation for three days); *Stevens v. McHan*, 3 F.3d 1204, 1207 (8th Cir. 1993) (citing cases suggesting the appropriate damages for unconstitutional placement in segregation range from $25 to $129 per

12

day); *Smith v. Rowe*, 761 F.2d 360, 368 (7th Cir. 1985) (affirming—in a case allowing damages for emotional and mental distress in addition to damages for the constitutional violation—a compensatory damages award of $80,770 for prisoner's wrongful and retaliatory placement in segregation for almost two years, which was about $119 per day).

As to the dates for which damages should be awarded, the entirety of Proctor's time in segregation is attributable to the false charge brought by Jefferson. Thus, the court will award damages from April 6, 2017, through and including June 16, 2017, the date Proctor was transferred to Sussex, a total of 72 days. Damages attributable to Proctor's time in segregation at Dillwyn, therefore, are $1,440 (72 days times $20/day).

As to his time at the higher-security prisons in Sussex and then Keen Mountain, the time period of damages directly caused by Jefferson's conduct is less clear. But in setting an end date, it is noteworthy that Proctor admits he became eligible for a transfer back to a lower-security prison at an unspecified date in March 2020. After that point, any connection between Jefferson's conduct and Proctor's housing assignment is too attenuated to attribute Proctor's continued placement at higher-level facilities to Jefferson's violation of his First Amendment rights. Indeed, even Proctor suggests that he thought he should have been transferred then and was not transferred because of an unexplained decision of his counselor's boss. Because Proctor did not provide any specific date in March on which he became eligible for transfer, he has not proven an entitlement to damages for any part of March 2020 (as he could have been eligible for transfer on March 1). Thus, I will award damages for the period from the first full day that he was at Sussex—June 17, 2017—through and including February 29, 2020,[7] a total of 988 days.

---

[7] Proctor was transferred to Keen Mountain the day before, on February 28, 2020, but that is not a factor in my analysis as to the time period for allowable damages.

13

Damages attributable to Proctor's time at Sussex (and one full day at Keen Mountain), therefore, are $4,950 (988 days times $5/day). Accordingly, the total amount of damages Proctor has proven is $6,375 ($1,440 plus $4,935).

In this case, however, the amount of damages that Proctor may recover is capped by the amount he requested in his complaint—$5,000 in damages and costs (Dkt. No. 1 at 14).[8] Because this is a default judgment, as opposed to a judgment after a contested trial, Federal Rule of Civil Procedure 54(c) directs that the judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings."

The Fourth Circuit has held that where, as here, a specific amount is demanded in the complaint, the relief available cannot exceed that amount. *Compton v. Alton Steamship Co.*, 608 F.2d 96, 105 n.16 (4th Cir. 1979) ("[T]he relief available on default [must] be such as within the fair scope of the allegations of the complaint and, when money judgment is sought, the specific amount demanded."); *see also In re Genesys Data Techs., Inc.*, 204 F.3d 124, 132 (4th Cir. 2000) (describing a "dizzying array of judicial decisions" addressing Rule 54(c), but summarizing that in cases where the "complaint demands a specific amount of damages, courts have generally held that a default judgment cannot award additional damages"), *certified question answered,* 95 Haw. 33, 18 P.3d 895 (2001). "The rationale is that a default judgment cannot be greater than the specific amount sought because the defendant could not reasonably have expected that his damages would exceed that amount." *In re Genesys Data Techs, Inc.*, 204 F.3d at 132; *Eddins v. Medlar*, 881 F.2d 1069, 1989 WL 87630, at *3 (4th Cir. 1989) (unpublished table decision) ("[T]he drafters [of Rule 54(c) obviously designed the rule to protect a contumacious party

---

[8] Proctor's motion for default judgment sought $1,000 in compensatory damages plus $462 in costs. (Dkt. No. 60-1 at 2.)

14

against his very contumacy.")

Pursuant to this authority, I recommend that the court enter judgment in Proctor's favor and against Jefferson in the amount of $5,000. Because Proctor also sought costs in his complaint and thus Jefferson was on notice that costs might be awarded against him, an award of costs, pursuant to Rule 54(d)(1), is also proper and would not violate Rule 54(c). *In re Ellison*, No. AP 20-80001-JW, 2020 WL 5612076, at *5 (Bankr. D.S.C. Apr. 23, 2020) (applying Rule 54(c) to conclude that costs were recoverable on a default judgment because they were sought in the complaint, but attorneys' fees, which were not included in the complaint, could not be awarded); *J & J Sports Prods., Inc. v. Waters*, No. 3:12-CV-267-RJC-DCK, 2012 WL 5930167, at *4 (W.D.N.C. Nov. 27, 2012) (allowing both attorneys' fees and costs on a default judgment where they were expressly sought in the complaint); *cf. Choice Hotels Int'l, Inc. v. Jai Shree Navdurga, LLC*, No. CIV. A. DKC 11-2893, 2012 WL 5995248, at *3 (D. Md. Nov. 29, 2012) (disallowing costs in the amount of the filing fee because costs were not requested in the complaint).

I also recommend, therefore, that the court include in its judgment a deadline for Proctor to file a bill of costs and award any reasonable and appropriate costs sought. *Cf. Walker v. Mod-U-Kraf Homes, LLC*, No. 7:12cv00470, 2014 WL 2450118, at *2 (W.D. Va. May 30, 2014) (noting that Rule 54(d) does not set a time limit for filing for costs, nor does this court's local rules).

**C.  Punitive Damages**

Given the facts as alleged by Proctor in his complaint, and as elaborated upon at the hearing, I conclude that punitive damages are probably warranted in this case. Nonetheless, Proctor's complaint did not expressly request punitive damages and did not include any amount for punitive damages, either. Pursuant to Rule 54(c), then, I do not recommend an award of

15

punitive damages.

## III.  CONCLUSION

Based on the foregoing analysis, I recommend that the district court enter judgment in Proctor's favor as against Jefferson and award damages in the amount of $5,000 in compensatory damages. I further recommend that the court set a specific date after entry of judgment by which Proctor can submit a bill of costs.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Elizabeth K. Dillon, United States District Judge.

The Clerk shall send copies of this Report and Recommendation to Proctor, to all counsel of record, and to Jefferson at his address of record.

                                            ENTER: November 4, 2020

                                            Joel C. Hoppe
                                            United States Magistrate Judge